ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Research Analysis & Maintenance, Inc. | ) ASBCA No. 63259 |
| | ) |
| Under Contract No. W56KGY-16-C-0022 | ) |

APPEARANCE FOR THE APPELLANT:  Tyler J. Kubinski, Esq.
                   Kubinski & Associates, P.C.
                   El Paso, TX

APPEARANCES FOR THE GOVERNMENT: Scott N. Flesch, Esq.
                   Army Chief Trial Attorney
                   MAJ James S. Kim, JA
                   Dana J. Chase, Esq.
                   Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE D'ALESSANDRIS
ON THE GOVERNMENT'S MOTION TO STRIKE COUNTS I, III, AND IV OF
APPELLANT'S COMPLAINT DUE TO LACK OF JURISDICTION

Appellant, Research Analysis & Maintenance, Inc. (RAM), appeals from a contracting officer's final decision denying its claim for certain costs it alleges it incurred in maintaining financial records for audit, as required pursuant to its contract with the Department of the Army (Army or government). The Army has moved to strike Counts I, III, and IV of RAM's complaint for lack of jurisdiction, alleging that the facts underlying those counts were not submitted to the contracting officer for decision. We grant the Army's motion in part and deny it in part.

STATEMENT OF FACTS FOR PURPOSES OF THE MOTION[1]

I.  The Contract

On September 29, 2016, the Army awarded Contract No. W56KGY-16-C-0022 to RAM for site support services to be performed for the Army Communications-Electronics Command (CECOM), Central Technical Support

---

[1] When deciding a motion to dismiss for lack of jurisdiction, the facts supporting jurisdiction are subject to fact-finding based upon the Board's review of the record. *See CCIE & Co.*, ASBCA Nos. 58355, 59008, 14-1 BCA ¶ 35,700 at 174,816.

Facility (CTSF) and Install Yard, located at Fort Hood, Texas[2] (R4, tab 1 at 1, 3).[3] The contract was a cost plus fixed-fee (CPFF), term level of effort and/or cost-reimbursable (CR) type contract for a three-year base period running from the date of award, with two option periods of six months each (*id.* at 3-4). Pursuant to Federal Acquisition Regulation (FAR) 52.217-9, OPTION TO EXTEND THE TERM OF THE CONTRACT (MAR 2000) the Army was required to provide the contractor with a "preliminary written notice of its intent to extend" 60 days prior to expiration of the contract, in order to exercise the option periods (R4, tab 1 at 102).

The contract incorporated by reference FAR 52.215-2, AUDIT AND RECORDS – NEGOTIATIONS (OCT 2010) (R4, tab 1 at 96; *see also id.* at 112 (FAR 52.252-2, CLAUSES INCORPORATED BY REFERENCE (FEB 1998)). That clause requires a contractor with a cost-reimbursement contract to maintain "all records and other evidence sufficient to reflect properly all costs claimed to have been incurred or anticipated to be incurred directly or indirectly in performance of this contract" to allow the contracting officer or the authorized representative to examine and audit them. FAR 52.215-2(b). The clause further provides as follows:

> *Availability.* The Contractor shall make available at its office at all reasonable times the records, materials, and other evidence described in paragraphs (a), (b), (c), (d), and (e) of this clause, for examination, audit, or reproduction, until 3 years after final payment under this contract or for any shorter period specified in [FAR] subpart 4.7, Contractor Records Retention . . . or for any longer period required by statute or by other clauses of this contract.

FAR 52.215-2(f).

The contract also included paragraph H-4, OPTION TO EXTEND SERVICES FOR UP TO SIX (6) –MONTHS (R4, tab 1 at 95).[4] This provision gave the Army the option to require continued performance for up to six months. Unlike the two option

---

[2] Fort Hood is now known as Fort Cavazos, effective May 9, 2023.

[3] The government numbered its pages in its Rule 4 submission with leading zeros, which we omit here. In addition, where we quote from correspondence between the parties we correct minor typographical errors for the sake of clarity.

[4] Paragraph H-4 is renumbered as paragraph H-3 in the conformed contract (R4, tab 1 at 5, 95). Because RAM refers to it as paragraph H-4 throughout its submissions, we do as well.

periods, which required 60 days advance written notice to the contractor, this clause only required 30 days written notice prior to its exercise.  (R4, tab 1 at 95, 102)

II.    RAM's Objections to the Army's Administration of its Contract

The government's Rule 4 file included dozens of emails between RAM's vice president and chief operating officer, Mr. Bob Waldron, and various government representatives sent between January 2020 and December 7, 2021 when RAM filed its claim.  We have carefully reviewed this correspondence and note that Mr. Waldron was not a man who easily took no for an answer.  Time and time again he would request a particular government action, be told his request was not possible or was premature, reply with detailed criticisms of various government actions, and re-request what had previously been denied (*see generally* R4, tabs 14-15, 22-23, 26-27, 120-22, 130-32, 135, 167, 171).  Thus, by the time he filed his claim he had developed a fairly discrete and well-defined list of grievances, which for the most part – but not always – tracked the prior correspondence.  We discuss the evolution of those grievances in more detail below.

   *A. RAM's Request that the Army Not Exercise the Contract's Second Option Period*

On or about September 30, 2019, the parties executed contract Modification No. P00036 (Mod. 36) exercising the first option period, which ran until March 29, 2020 (R4, tab 1 at 23).  On January 3, 2020, Mr. Waldron verbally informed the Army that RAM hoped to complete a sale of the company by the end of January 2020 (R4, tab 104 at 1077-78).  He provided written notice of that sale by email dated January 7, 2020, to Ms. Megan Grigas, the contracting officer.  In that email he indicated he was not interested in novating the contract to the purchaser because he believed it would extend the audit process.  He stated, "I will be 74 years old during May 2020 and do not want to await contract closure and a settlement a minimum of three more years down the road."  (R4, tab 119 at 1156)  He requested that the Army not exercise the second option period but instead allow RAM to complete performance of the first option period on March 29, 2020, suggesting the Army could make a sole source award to RAM's subcontractor effective March 30, 2020 (*id.*).  Mr. Waldron participated in a telephone conference with Ms. Grigas and various other government representatives on January 15, 2020, at which time he again informed them that "RAM was in the process of shutting down its operations" and wished to close out the contract quickly (R4, tab 108 at 1089).

Nevertheless, the Army elected to exercise the second option period.  However, the Army failed to notify RAM of its intention to do so within the contractually required period of 60 days, which Mr. Waldron believed was worthy of criticism (R4, tab 120 at 1159-62).  The Army instead exercised a six-month extension pursuant to

3

paragraph H-4, which only required 30 days' notice. The parties executed bilateral contract Modification No. P00041 (Mod. 41) on March 24, 2020, extending RAM's performance to September 29, 2020. (R4, tab 1 at 24, tab 72 at 896-97, tab 73 at 904-05)

### B. RAM's Request for CARES Act Section 3610 Reimbursement

On March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (CARES Act). *See* Pub. L. No. 116-136, 134 Stat 281 (2020). Section 3610 of the CARES Act (hereinafter Section 3610) permitted federal agencies to reimburse contractors for paid leave for employees and subcontractors unable to perform their work duties due to the COVID-19 pandemic. 134 Stat. 281, 414.

Mr. Waldron began requesting reimbursement under Section 3610 three days after the statute was enacted (R4, tab 121 at 1165). Although the Army told him his request was premature because no guidance had been issued, he continued raising the issue during the ensuing days (*id.* at 1164; *see also* R4, tab 122 at 1167-70). On April 17, 2020, the Army provided RAM with instructions for how to submit documentation to support his request for reimbursement, which RAM provided on April 21, 2020 (R4, tabs 74, 76, 123). RAM also provided an Excel spreadsheet listing three cost elements for three blocks of time between March 29 and September 29, 2020, totaling $411,375.94 (R4, tab 75; *see also* R4, tabs 77-80 (statements of employee earnings)).

The Army prepared a cost and price evaluation of RAM's submission on April 30, 2020 (R4, tab 90 at 1009), but took no further action until September 9, 2020. On that date the contract specialist, Mr. Rickey Hampton, informed RAM that the Army had recently revised its Section 3610 guidance and that he was forwarding new instructions for obtaining reimbursement. RAM provided the Army with its revised Section 3610 request on September 14, 2020. (R4, tabs 81, 87, 125, 126 at 1177)

On September 28, 2020, the contracting officer's representative found RAM's proposal to be acceptable (R4, tabs 94, 127 at 1180). On November 20, 2020, Mr. Hampton found the revised amount of $102,954 to be fair and reasonable (R4, tab 92 at 1024-25). In a memorandum for the record signed on December 16, 2020, Ms. Grigas found that granting RAM's requested Section 3610 reimbursement was in the best interest of the government and would be provided via contract Modification No. P00045 (Mod. 45) (R4, tab 95 at 1035; *see also* R4, tab 96 (determination and findings)). Mod. 45, signed by Ms. Grigas on December 16, 2020, with an effective date of March 27, 2020, established CLIN 1009, which provided RAM's requested Section 3610 reimbursement in the amount of $102,954 (R4, tab 98 at 1045).

4

## C. RAM's Request that the Army Use Quick-Closeout Procedures

In late summer 2020, Mr. Waldron began to agitate for his contractual obligations to cease completely when the second option period expired. Between August 17, 2020 and October 7, 2020, Mr. Waldron emailed various government representatives more than a dozen times, pressing them to effect a "quick close out"[5] of the contract. (*See generally* R4, tabs 130-32, 135) He contacted the administrative contracting officer, Mr. Homero Ramos, by email four times (and spoke to him via telephone once), each time reminding him that RAM would no longer be in business by the end of the second option period and could not afford to maintain staff to support the audit process (*See* R4, tab 130 at 1197-1200, 1202-06). He requested that Mr. Ramos as the administrative contracting officer establish a CLIN that would extend the period of performance to pay RAM for its audit support, and eventually suggested a dollar figure of $8,610 per month for the proposed "close out CLIN" (R4, tab 130 at 1198).

His communications with Ms. Grigas were similarly insistent. He repeatedly remonstrated her for exercising the second option period, stating that but for that decision, RAM could have supported contract closeout activities while still earning reimbursement via its G&A rate. (R4, tab 130 at 1191, tab 132 at 1226-27) One of those emails included a lengthy diatribe criticizing her administration of the contract (R4, tab 132 at 1224-27). He also insisted more than once that she did not understand FAR 42.708 or the contract closeout process (R4, tab 130 at 1191, tab 132 at 1226). At one point, he forwarded some of his correspondence with her to a different contracting officer, apparently believing that because the other contracting officer was "more experienced" she might "see the value/benefit" of a quick-closeout (R4, tab 130 at 1192-93).

In various responses at various times, government representatives attempted to communicate to Mr. Waldron that his wish to cease all of his obligations at the conclusion of the second option period was unrealistic (*see* R4, tab 130 at 1191-92 (Ms. Grigas stating that contract closeout could not be completed before final indirect rate costs had been determined by DCAA audit and that his request for $8,610 per month would not be allowable because RAM had already been reimbursed via its G&A rate), tab 1194-95 (Ms. Grigas stating that closing out the contract could take up to five years), tab 1196 (Mr. Ramos informing Mr. Waldron that even with quick-closeout it would still take 8-12 months to close out the contract)).

---

[5] "Quick close out" (or "quick-closeout" as it appears in the FAR) refers to a process described in FAR 42.708 allowing for the contracting officer responsible for closing out a contract to, in some circumstances, negotiate the settlement of direct and indirect costs in advance of determining final direct costs and indirect rates.

Between October 5 and October 7, 2020, Mr. Waldron and Ms. Grigas exchanged four emails, with Ms. Grigas continuing to explain that it would not be possible to use quick-closeout procedures or otherwise close out the contract as quickly as Mr. Waldron wished, and Mr. Waldron continuing to dispute whether she was correct (R4, tab 135 at 1238-42).  The Board was unable to locate any further communications in the record about quick-closeout after October 7, 2020.

### D.  RAM's Request that the Army Eliminate the Contract's Records Retention Requirement Contained in FAR 52.215-2

The record contains relatively few pieces of correspondence between the parties from December 2020 until April 2021, when Mr. Waldron advised the contract specialist, Mr. Hampton, that he had received his final fiscal year (FY) 2017-2019 "DCAA rate letters" (R4, tab 171 at 1837).  On July 22, 2021, Mr. Waldron advised Mr. Hampton that he had received his final FY 2020 indirect cost rate letter from DCAA (R4, tab 171 at 1836-37).  On July 29, 2021, Mr. Waldron suggested to Mr. Hampton that a pending modification to address realignments of CLINs he previously requested include two "claims" he was preparing – the first for costs incurred between September 30 to December 30, 2020 for retaining employees in an on-call status and the second for costs incurred between January 1 to July 31, 2021 for "delaying RAM's capability to develop and submit its Incurred Cost Report" (R4, tab 171 at 1835-36).  Both of these categories of costs Mr. Waldron alleged he incurred while awaiting the award of Mod. 45 (*id.* at 1835). [6]  On August 13, 2021, Mr. Hampton advised Mr. Waldron that his email regarding the two claims had been forwarded to the "legal office and contracting is waiting on legal to publish its decision on the matter" (R4, tab 171 at 1835).

Responding to Mr. Hampton via email later that day, Mr. Waldron indicated an apparent belief that the legal department was considering the "feasibility/advisability of negotiating a final settlement amount of this contract simultaneously converting . . . [it] into a Firm Fixed Price Contract" (R4, tab 171 at 1831).  He then set forth his argument on why the government should agree to do so.  Those reasons included the fact that RAM's FY 2017-2018 incurred cost audits found no unallowable costs, and that DCAA found RAM's incurred cost proposals for FY 2019-2020 were adequate and low risk and therefore did not require audits.  He then spent the rest of the email reprising in detail his many complaints with the Army's administration of his contract.  Mr. Hampton replied later that day that he would forward Mr. Waldron's request to the Army's legal advisor and that the Army would contact Mr. Waldron if it needed any other information.  (R4, tab 171 at 1831-35)

---

[6] While the email does not explicitly identify by number which modification Mr. Waldron was discussing, from the context, we infer that it was Mod. 45.

On September 14, 2021, Mr. Hampton sent Mr. Waldron a draft copy of Modification No. P00049 (Mod. 49), to be signed by a new contracting officer, Mr. Shawn Jamerson. The purpose of Mod. 49 was to realign funds and allow RAM to submit its FY 2020 settlement invoices for various CLINs. Mr. Waldron rejected the draft because it did not address his wish to eliminate the records retention requirement in FAR 52.215-2. He again suggested the requirement could be waived, or alternatively Mr. Jamerson could provide a firm fixed price CLIN to cover the costs of complying, proposing a dollar figure of $130,787.04. If Mr. Jamerson declined to adopt his suggestion, he indicated he would file a claim for those costs on a monthly basis throughout the full three-year period. (R4, tab 14 at 384-87)

On September 16, 2021, Mr. Hampton sent Mr. Waldron a new version of Mod. 49. This version added a new paragraph (hereinafter paragraph 5), which stated that the Army would not waive the requirement under FAR 52.215-2(f) to make records available for three years after final payment for audit purposes, and 2) would not provide a firm fixed price CLIN to cover any costs RAM incurred complying with FAR 52.215-2(f). (R4, tab 15 at 399, 402)

On September 17, 2021, Mr. Waldron rejected that draft. In an email addressed to Messrs. Hampton and Jamerson from the Army, Mr. Ramos from DCMA and a representative from DCAA, Mr. Waldron requested that DCMA and DCAA "opine on whether these costs are allowable" under the contract. (R4, tab 15 at 396) He warned that he intended to file a claim for his costs each month for the next 36 months, and an appeal with the Board on a monthly basis as well, until his costs were reimbursed (*id.*). Mr. Waldron once again recited the "multiple Contracting Office actions and delays" he had complained of before, going back to the contract's award date of September 29, 2016 (*id.* at 397-98).[7] He closed by again requesting the negotiation of a firm fixed price CLIN to cover the costs of maintaining the office he contended was required by FAR 52.215-2(f) (*id.* at 398-99).

On September 22, 2021, Mr. Jamerson responded to Mr. Waldron's admonition that he intended to file claims for each of the next 36 months, telling him that "[t]he Government understands RAM's choice for course of action" and requesting that he sign the modification (R4, tab 16 at 410). Later that afternoon, Mr. Waldron emailed Mr. Ramos and the DCAA representative separately asking their opinion on whether the costs associated with maintaining an office to comply with FAR 52.215-2 would be allowable and reimbursable. The DCAA representative told Mr. Waldron DCAA

---

[7] This time he added to his prior list of grievances purported delays in awarding several other modifications, including several relating to wage determinations from 2015-2016 and the reallocation of labor cost funds from CLIN 0001 to CLIN 0004 (R4, tab 15 at 397-98).

had no role in the process unless DCMA affirmatively requested assistance. (R4, tab 167 at 1726-28) On October 5, 2021, Mr. Ramos informed Mr. Waldron that he believed the costs would be unallowable because RAM "was aware of and agreed to" the contract's terms and conditions at award, including FAR 52.215-2. He further stated that if RAM had intended to charge for costs associated with that clause, such costs should have been included in RAM's proposal. He concluded by advising Mr. Waldron that "there is no requirement to maintain an idle facility simply to keep records. That requirement could be met by saving the records to a hard drive or on a single laptop." (R4, tab 167 at 1725)

Also on October 5, 2021, Mr. Jamerson forwarded to Mr. Waldron a new draft Mod. 49 (R4, tab 18 at 429). That draft eliminated the language from paragraph 5 described above and replaced it with the following: "[e]xcept as provided herein, all other terms and conditions remain unchanged, and in full force and effect" (*id.* at 436). Mr. Waldron returned a signed copy of Mod. 49 to Mr. Jamerson two days later, but again raised the question of whether DCAA might agree with his suggestion that the records retention requirement in FAR 52.215-2 be eliminated. By email dated October 13, 2021, Mr. Jamerson returned the fully executed Mod. 49 to Mr. Waldron without comment. (R4, tab 22 at 493)

Between October 22 and November 12, 2021, Mr. Waldron emailed Mr. Jamerson three times about his desire that RAM be awarded a modification extending performance from September 29, 2020 to September 29, 2024. Mr. Waldron contended this was necessary to compensate RAM for the costs of maintaining an office, which he insisted was the only way he could comply with FAR 52.215-2. He warned Mr. Jamerson again that if he did not award the requested modification, RAM would file claims each month for the next 36 months. (R4, tab 23 at 522-23, tab 24 at 529, tab 27 at 561-62) Mr. Jamerson responded by repeating what Mr. Waldron had previously been told – that FAR 52.215-2 did not require him to maintain an office, and that scanning to a storage device or maintaining a storage unit or home safe would be sufficient (R4, tab 26 at 550).

Between November 12, 2021 and December 7, 2021, Mr. Waldron made a total of four attempts to file a claim before the contracting officer recognized the claim and endeavored to respond to it (*see* R4, tabs 25, 28, 30, 35-38).

III.   RAM's December 7, 2021 Claim

RAM's claim sought $53,002.19 in other direct costs consisting of the costs of providing an office from October 2020 through October 2021 (R4, tab 37 at 666-72). The claim identified as "justification for why these other direct costs are allowable and reimbursable" (R4, tab 37 at 668) the following actions taken by the contracting officer:

8

1. RAM did not want the contracting officer to exercise the second option period and even suggested that an award be made to RAM's Section 8(a) subcontractor pending a new competition, or that RAM be allowed to sell the business unit to the same subcontractor. However, after RAM participated in a January 15, 2020 conference call with DCMA, DCAA and the Army to discuss the issue, "it was determined there was not adequate time to allow a sale of the business unit and it was not in the governments [sic] best interest to award an interim 8(a) sole source award." (R4, tab 37 at 667)

2. The contracting officer failed to timely exercise the second option period, rendering her "unilateral authority to award" that option void. Instead, she "compelled RAM's continued performance" under paragraph H-4, OPTION TO EXTEND SERVICES, which the claim described as "a second action by the [contracting officer] deemed to be in the government's best interest exercising its privilege by forcing RAM to continue supporting this contract through September 2020." (*Id.*)

3. The contracting officer's decision to exercise the second option period denied RAM the ability to declare a short fiscal year for FY 2020 which would have allowed it to file its incurred cost report in the summer of 2020. Instead, RAM had to wait until Mod. 45 was issued in December 2020 (the CARES Act Section 3610 reimbursement) to "begin finalizing its FY 2020 accounting to begin preparation of its FY 2020 Incurred Cost Report." (*Id.*)

4. The contracting officer "elected not to give priority" to awarding Mod. 45 during August and September 2020 while RAM was still performing under the contract, even though she knew RAM would no longer be an operating business and could not file its FY 2020 incurred cost report until after the modification was awarded. RAM also could not submit an interim cost reimbursement voucher until after Mod. 45 was issued, which resulted in unrecoverable interest losses. (*Id.* at 669)

9

5. The delay in awarding Mod. 45 violated the Anti-Deficiency Act in two ways: First, because "RAM incurred . . . costs at the [contracting officer's] direction for more than 8 months before appropriated funding was provided" (*id.* at 668-69), and second, because the contracting officer appeared to be "demanding" that RAM perform without reimbursement, which "constitute[d] a voluntary service that the [contracting officer] is prohibited from accepting" (*id.* at 669).

6. The contracting officer did not timely act in response to RAM's notices that it had received its indirect rate letters for FY 2017-2019. This led to delays in settlement on various portions of the contract and undue delay (until June 2021) in the award of modification P00047 (Mod 47) realigning contract funding to support settlement invoices. (*Id.* at 669)[8]

Attached to the claim was a one-page spreadsheet titled "RAM Other Direct Costs Incurred to Support Contract W56KGY-16-C-022 Close Out Requirements (FAR Clause 52.215-2)." The spreadsheet listed nine categories of other direct costs per month from October 2020 through October 2021 totaling $53,002.19. (R4, tab 37 at 672)

In the cover email accompanying the claim, Mr. Waldron described "[p]rior contract[ing] officer actions . . . [as not being] in keeping with the standards of fairness and equitable treatment" and "tantamount to compelling RAM to provide no interest loans to the government" (R4, tab 37 at 664). He argued that it was "grossly unfair" for the Army to have RAM continue incurring costs without reimbursement, and that the cumulative impact of the delays he was alleging "adversely impacted the small fee" RAM proposed and was paid under the contract (*id.* at 665). The email was otherwise largely duplicative of the claim itself with the exception of the following two issues, which did not appear in the claim:

---

[8] The claim also refers to the fact that the contracting officer delegated responsibility to DCAA to determine the final indirect rates pursuant to FAR 42.705-2, and then quotes language from the 2021 version of FAR 42.705-2(a)(2)(i)-(iv), which addresses discretionary circumstances when "auditor determination" may be used. After the quoted language, the following sentence appears: "The first three of these circumstances [(i)-(iii)] are applicable to this contract" (R4, tab 37 at 670). There is no other discussion of the relevance of this FAR provision in the claim.

1. When the contracting officer awarded Modification No. P00005 (Mod. 5) in April 2017 incorporating revisions to two applicable Service Contract Act (SCA) wage determinations backdated to September and December 2016, she failed to compensate RAM for the labor cost impact until September 2017 with the award of modification P00010 (Mod 10). This prevented RAM from timely submitting a cost reimbursement voucher "with the resulting interest losses that were not recoverable." (*Id.* at 664)

2. In August 2017, the contracting officer de-obligated $75,000 in labor costs under CLIN 0004 with Modification No. P0008 (Mod. 8) but failed to add them back into CLIN 0001 "where the labor costs were being incurred based upon the COR's assigned priorities" until she awarded Modification No. P0025 (Mod. 25) in December 2018. This time lag impacted RAM's ability to submit an interim cost reimbursement voucher "with the resulting interest losses that were not recoverable." (*Id.*)

Mr. Waldron closed the cover email by suggesting again what he had advocated for many times before. He requested that Mr. Jamerson negotiate a final modification converting the contract to firm fixed price, delete FAR 52.215-2 from the contract and extend performance under CLIN 1005 through November 2021, which he said would allow RAM to recover its other direct costs "consistent with the requirements of this contract and this claim." (*Id.* at 665)

By email dated January 28, 2022, Mr. Jamerson forwarded his final decision denying RAM's claim (R4, tab 54). The contracting officer noted that the solicitation put offerors on notice of the type of contract being awarded, and included FAR 52.215-2, where the records retention requirement appears. He quoted from the portion of RAM's proposal that described RAM's estimating systems and how it calculated its G&A rate. (*Id.* at 807-08) He concluded that "RAM was on notice of the FAR 52.215-2 requirements at the time it submitted its proposal, included these costs in its G&A rate calculation, and is not entitled to additional, separate, reimbursement of costs associated with the FAR 52.215-2 requirement after the period of performance has lapsed" (*id.* at 809). RAM timely filed its notice of appeal with the Board on April 22, 2022.

11

RAM bears the burden of establishing the Board's jurisdiction by a preponderance of the evidence. *See Tolliver Grp., Inc. v. United States*, 20 F.4th 771, 775 (Fed. Cir. 2021); *Selevive Grp., LC*, ASBCA Nos. 63292, 63293, 22-1 BCA ¶ 38,220 at 185,636. Under the Contract Disputes Act (CDA), "[e]ach claim by a contractor against the Federal Government relating to a contract shall be submitted to the contracting officer for a decision." 41 U.S.C. § 7103(a)(l). Requiring that the claim first be presented to the contracting officer permits "opportunities for informal dispute resolution at the contracting officer level . . . ." *Tolliver Grp.*, 20 F.4th at 776 (quoting *Raytheon Co. v. United States*, 747 F.3d 1341, 1354 (Fed. Cir. 2014)). Because the contractor's claim determines the scope of any subsequent appeal, the Board does not possess jurisdiction over new claims not previously presented to the contracting officer. *See MACH II,* ASBCA No. 56630, 10-1 BCA ¶ 34,357 at 169,673.

A claim presented to the Board will be considered the same as the claim presented to the contacting officer if it arises from the same set of common or related operative facts and requests the same or similar relief. *Parwan Grp. Co.*, ASBCA No. 60657, 18-1 BCA ¶ 37,082 at 180,495. Allegations presenting a new legal theory of recovery or introducing additional facts not altering the nature of the original claim do not constitute a new claim provided they rely upon the same operative facts included in the original claim. *Trepte Constr. Co.,* ASBCA No. 38555, 90-1 BCA ¶ 22,595 at 113,385-86. A "claimant is free to change its legal theory as long as it is not materially different from what was presented in the claim" to the contracting officer. *Wilwood Eng'g Inc.*, ASBCA Nos. 62773, 62774, 22-1 BCA ¶ 38,116 at 185,144 (citing *Tolliver Grp, Inc.*, 20 F.4th at 777). A materially different legal theory, on the other hand, requires the decisionmaker to "focus on a different or unrelated set of operative facts." *Lee's Ford Dock, Inc. v. Dep't of the Army*, 865 F.3d 1361, 1369 (Fed. Cir. 2017) (internal citation omitted). In those circumstances, "the essential nature of the claim has been changed and we do not have jurisdiction over the new claim until it is presented to the contracting officer for decision." *Parwan*, 18-1 BCA ¶ 37,082 at 180,495 (quoting *Shams Eng'g & Contracting Co. & Ramli Co.,* ASBCA Nos. 50618, 50619, 98-2 BCA ¶ 30,019 at 148,525).

The Parties' Contentions

The Army has moved to strike Counts I, III, and IV of RAM's complaint, asserting that it was "not aware of the operative facts underlying the allegations contained [those counts] until the government received the complaint" (gov't mot. at 12). According to the Army, RAM's claim did not raise any of the following operative facts contained in RAM's complaint:

> [T]hat the CO: (1) extended performance under the Contract by delaying processing of the appellant's CARES Act claim; (2) that the CO acted in bad faith; and (3) that the CO was incompetent or acting in bad faith by failing to process contract modifications in a time frame satisfactory to the appellant, and because the appellant had to wait for invoice payments until DCAA completed its audit of the appellant's costs[.]

(Gov't mot. at 10)  In its reply filed in support of its motion, the Army also argues that RAM did not provide a sum certain for damages resulting from allegations made under Counts I, III, and IV (gov't reply at 7; *see also* gov't sur-reply at 2-3). [9]  In its sur-reply, the Army adds to its list of purported new claims RAM's reference in Count I to FAR 52.242-17, GOVERNMENT DELAY OF WORK (APR 1984), arguing that RAM "assert[ed] different operative facts than those" asserted under Count I and further did not assert "damages associated" with that purported new claim (gov't sur-reply at 3-4 and n.2).

RAM contests the Army's claim that it was unaware of the operative facts in Counts I, III, and IV of RAM's complaint.  It then quotes verbatim from large portions of its December 7, 2021 claim to establish that the Army's contentions are not correct. (*See* app. resp. at 3-5, 7-10; app reply at 4) [10]

Comparison of RAM's Complaint to Its Claim

We have reviewed RAM's 22-page, single-spaced complaint (and its 323 pages of exhibits) and compared Counts I, III, and IV with RAM's December 7, 2021 claim and cover email.  For ease of analysis our comparison is organized according to the headings and subsections identified in the complaint.

---

[9] RAM filed a reply to the Army's reply in support of its motion to dismiss, something our Rules do not contemplate.  We nevertheless accepted that submission (designated as app. reply) and provided the Army with an opportunity to respond (designated as gov't sur-reply).

[10] These citations are to pdf page numbers as RAM did not number the pages of these two documents.

*Count I – Contracting Officer Extended the Contract by Delays and Inactions*

> ### a. *Delayed Award CARES Act Labor CLIN Modification*

In Count I.a, RAM alleges that the contracting officer delayed awarding relief under Section 3610 of the CARES Act, thereby extending performance beyond September 29, 2020, denying RAM timely reimbursement of its properly incurred costs, and preventing it from finalizing its FY 2020 incurred cost report to DCAA (compl. at 3-5). Subsection a. concludes with a one-sentence assertion that the purported delay in awarding Mod. 45 "represent[ed] an intentional Bad Faith act that caused [RAM] to incur additional costs and effectively extended . . . [RAM's] contract performance consistent with the provisions of FAR 52.242-17(a)(2)" (compl. at 5-6).

The allegations contained in this subsection are substantially the same as those RAM's included in its claim. RAM's claim specifically alleged that the contracting officer "elected not to give priority to" (i.e., "delayed") awarding Mod. 45 for RAM's Section 3610 request (R4, tab 37 at 669). RAM's claim also specifically referenced the delay in "finalizing its FY 2020 accounting to begin preparation of its FY 2020 Incurred Cost Report" as one of the alleged harms caused by the purported delay in awarding Mod. 45 (*id.* at 667). This subsection does not introduce any new facts materially changing the nature of the claim presented to the contracting officer. *Trepte Constr. Co.*, 90-1 BCA ¶ 22,595 at 113,385-86.

The subsection's one-sentence allegation that this purported delay constituted bad faith and extended performance "consistent with FAR 52.242-17(a)(2)" (compl. at 2) also does not constitute a new claim. With this sentence RAM is asserting two new legal theories – that the contracting officer's conduct constituted bad faith, and that a particular contract clause supports RAM's claim to payment – both of which are based upon the same operative facts alleged in its claim. We therefore find that the Board possesses jurisdiction over Count I, subsection a of RAM's complaint.

> ### b. *Contracting Officer Declined to Timely Execute Quick-Closeout of Contract as Authorized by FAR 42.708*

Count I.b, describes Mr. Waldron's dissatisfaction with the government's decision not to use the quick-closeout procedures under FAR 42.708 (compl. at 6-9). Although Mr. Waldron was very vocal between August and October of 2020 about his wish to have the quick-closeout procedures used to close out his contract (*see* R4, tabs 130-32, 135), the record does not reflect that he raised the issue again after October 7, 2020, a full year before he filed his claim. The term "quick-closeout" or "quick close out" does not appear in either the claim or the cover email. The relevant regulation, FAR 42.708, also does not appear in the claim or cover email, and neither contain any generic discussion or reference that could be attributed to the quick-

14

closeout issue.  It is true that "we do not consider claims in a vacuum" and may consider outside correspondence to "elaborate on a claim document or to put it into context." *Charles F. Day & Assocs. LLC*, ASBCA No. 60211 *et al.*, 19-1 BCA ¶ 37,215 at 181,173 (citations omitted).  However, that flexibility does not extend to using communications to create new claims that were not submitted to the contracting officer.  *Id*.  Accordingly, we do not possess jurisdiction over Count I.b and strike it from the complaint.

> *Count III – Contracting Officer's Apparent Bad Faith Contract Administration Actions*

Under Count III, RAM alleges that that the contracting officer engaged in purported bad faith actions "in retaliation for RAM's expressed desire to cease business operations and end this contract on 29 March 2020" (compl. at 15).  RAM further alleges that at least some of the purportedly delayed contract actions were "designed to force RAM to incur costs that the Contracting Officer would subsequently consider to be non-reimbursable. . . . [T]his may be a case of incompetence but there are firm indications of acting in Bad Faith by this Contracting Office" (*id.*).

Count III includes the following factual allegations:  1) that in January 2020 RAM told the contracting officer it was discussing sale of the business unit with another company and wished to cease performance at the end of the first option period; 2) that on January 15, 2020 RAM and the government discussed various possibilities including novation, award to the current subcontractor or an interim section 8(a) sole source award; 3) that the contracting officer later determined it was not in the government's best interest to award an interim section 8(a) sole source award; and 4) that the contracting officer failed to timely notify RAM of her intention to exercise the second option period which required her to use paragraph H-4 of the contract, OPTION TO EXTEND SERVICES (compl. at 15-16).  These allegations also appeared in RAM's claim (*see* R4, tab 37 at 667).[11]  Count III's characterization of these actions as bad faith is not a new claim; it is merely the assertion of a new legal theory based upon the same facts previously presented to the contracting officer.  Accordingly, we possess jurisdiction over Count III.  *Trepte Constr. Co.*, 90-1 BCA ¶ 22,595 at 113,385-86.

---

[11] While the topics discussed in the January 15, 2020 conference call differ slightly in description between the claim and complaint, their focus is the same – RAM's wish to cease performance at the end of the first option period and different ways in which that wish might be fulfilled.  *See Trepte Constr. Co.,* 90-1 BCA ¶ 22,595 at 113,385-86.

RAM's complaint also includes facts that do not appear in its claim or cover email, including a summary of the Army's administration of a predecessor contract with a different contractor between 2011 and 2016 (including the exercise of option periods and a six-month extension of performance) (compl. at 16), and a critique of the manner in which the Army conducted the follow-on procurement intended to replace RAM at the conclusion of its contract performance (*id.* at 17). The complaint alleges that this is evidence that the contracting officer "simply did not want to expend the effort to accommodate RAM's request" to cease performance on March 29, 2020 (*id.* at 18). We interpret RAM's complaint as asserting these facts as support for its contention that the Army, in RAM's view, was unreasonable in extending the performance period of its contract, and that the Army could have negotiated a new contract with its subcontractor, and not as elements of a new claim. Here, RAM is alleging additional facts that do not alter the nature of the original claim. *Trepte Constr. Co.*, 90-1 BCA ¶ 22,595 at 113,385-86.

> *Count IV – Demonstrated Contracting Officer Contract Administration Incompetence*
>
>> a. *Delayed Award of Cost Impact for Incorporating Revised [Service Contract Act] Wage Determination*

Count IV.a arises out of the contracting officer's award of Mod. 5 in April 2017, which incorporated two SCA wage determinations (compl. at 18-19, ex. 46). RAM alleges the purported delay in awarding Mod. 5 caused it to incur "costs for implementation for almost a full year of performance before being authorized to seek reimbursement" under Mod. 10 (compl. at 18). While this allegation does not appear in RAM's claim itself, it does appear in the cover email that accompanied the claim (R4, tab 37 at 664) and we examine the totality of the correspondence. *See Pub. Warehousing Co.*, ASBCA No. 56022, 11-2 BCA ¶ 34,788 at 171,228-29. Accordingly, we possess jurisdiction over subsection a. of Count IV and decline to strike it from the complaint.

>> b. *Delayed Contract Modification to Align Funding of Labor CLINS Consistent with COR Work Order Priorities Delaying Interim Cost Reimbursement Vouchers*

Count IV.b also arises out of the contracting officer's award of Mod. 5, which in addition to the SCA wage increase, obligated funding for carpet installation and increased the ceiling for CLIN 0001 (compl. at 19, ex. 46 at 2). RAM's complaint alleges that the award of Mod 5 and the "COR's prioritization of work orders were impacting labor costs within CLINs 0001 and 0004" (compl. at 19). RAM requested a realignment of those labor costs to reflect the actual work performed, but the contracting officer did not properly or timely do so (*id.*). Ultimately the Army did not

16

reimburse RAM for these costs until March 2019, and "interim cost vouchers for all costs incurred to support this contract from December 2018 through February 2019 were further delayed from reimbursements" (*id.* at 20).

This narrative does not appear in RAM's claim but does appear in the cover email to RAM's December 7, 2021 claim, albeit in a much more summary fashion (R4, tab 37 at 664). While the complaint describes some events from 2018 and 2019 that were not included in the claim or cover email, those additional details flesh out the basic allegation contained in the cover email that the contracting officer failed to timely address the labor cost shortfall. As such, they constitute additional operative facts that do not alter the nature of the original claim. *See Trepte Constr. Co.,* 90-1 BCA ¶ 22,595 at 113,385-86. Accordingly, we possess jurisdiction over Count IV.b, and decline to strike it from the complaint.

### c.  *Delaying Indirect Rate Settlements for DCAA Completed Audit Years*

Count IV.c alleges that the contracting officer repeatedly deferred or delayed acting on RAM's indirect rate letters from DCAA for FY 2017-2019, did not agree that RAM could submit settlement invoices until May 2021, and did not realign funding to support those invoices until it issued Mod. 47 in late June 2021 (compl. at 20). We possess jurisdiction over this portion of Count IV.c as RAM's claim includes the basic substance of these allegations (R4, tab 37 at 669-70).

Subsection c. also includes a summary of Mr. Waldron's attempts in August - September 2021 to convince the contracting officer to execute a modification that would not require RAM to "retain an office to maintain the contract records for another 36 months beyond final reimbursement" (compl. at 21). After noting that the contracting officer "was unwilling to close the contract on a firm fixed price basis" (*id.* at 21), the complaint states that the award of Mod. 49 in October 2021 "allowed RAM to submit settlement invoices for all FY 20 performance CLINs during the option period 1 and the six month extended periods of performance" (*id.*), for which RAM was reimbursed on November 2, 2021 (*id.*).

While this narrative does not explicitly allege that the contracting officer's actions in declining to close out the contract in the manner requested by Mr. Waldron was improper, for purposes of this motion we will infer that this was the purpose of including it in the complaint. We decline to strike Count IV.c as Mr. Waldron discussed his desire for this particular resolution in the cover email to his claim (R4, tab 37 at 665).

The Sum Certain Requirement

Finally, we address the Army's sum certain argument. According to the Army, RAM's appeal should be dismissed because RAM has failed to identify a sum certain for Counts I, III, and IV of its complaint:

> The appellant did not provide a sum certain concerning the damages alleged to have been caused by the delay in processing the appellant's modifications concerning the CARES Act, bad faith on the part of the CO, and incompetence in administering the Contract. Standing alone, Counts I, III, and IV are not claims within the definition of the FAR as there is no sum certain attached to any of them.

(Gov't reply at 7 (citing *ECC Int'l Constructors, LLC*, ASBCA No. 59643, 21-1 BCA ¶ 37,967 at 184,400; *rev'd and remanded*, *ECC Int'l Constructors v. Sec'y of the Army*, 79 F.4th 1364 (Fed. Cir. Aug. 22, 2023)) The Army then identifies particular items that it appears to believe require a "separate claim for damages,"[12] and asserts that the "only valid claim before the Board concerns whether [RAM] can be reimbursed for its costs for maintaining its records under" FAR 52.215-2 (gov't sur-reply at 4-5). As an initial matter, we normally do not consider arguments raised for the first time in a reply brief. *See, e.g., Buck Town Contractors & Co.*, ASBCA No. 60939, 18-1 BCA ¶ 36,951 at 180,059. Here, RAM filed a sur-reply brief, so we would be willing to consider the Army's argument; however, the Board opinion it relies upon has been reversed, and is no longer good law. *See also ECC Int'l Constructors, LLC v. Sec'y of the Army*, 79 F.4th 1364 (Fed. Cir. Aug. 22, 2023) (precedential opinion in the related appeal of ASBCA No. 59586).

We agree with the Army that the only valid claim before the Board is whether RAM can be reimbursed for the costs it alleges it has incurred to maintain its records under FAR 52.215-2. That is the gravamen of RAM's claim – that the contracting officer engaged in certain contract administration actions RAM believes were improper, and that but for those improper actions, RAM would not have had to incur the costs of maintaining an office to comply with FAR 52.215-2. The portions of

---

[12] These items include the following: 1) RAM's statement in the claim's cover email that the time to complete Mod. 45 was "tantamount to a no interest loan" (gov't sur-reply at 4); 2) the reference to imposing "unrecoverable costs" in an introductory sentence to Count IV of the RAM's complaint (gov't sur-reply at 5); and 3) the allegations of bad faith conduct in Count III (gov't sur-reply at 4-5).

RAM's claim and complaint[13] that the Army alleges require a sum certain do not constitute separate claims. Instead, they are part and parcel of RAM's many complaints about the manner in which the Army administered the contract. The claim is very clear that RAM only seeks reimbursement for the costs it alleges it has incurred as of October 2021 to comply with FAR 52.215-2. RAM's claim provided a finite dollar figure for those costs – $53,002.19. (R4, tab 37 at 672) We therefore deny this portion of the government's motion.

## CONCLUSION

The Army's motion is granted in part and denied in part. With respect to Count I, the Board denies the Army's motion to strike with respect to Count I.a, but grants the motion to strike with respect to Count I.b. With respect to Counts III and IV, the Board denies the motion to strike.

Dated: October 18, 2023

DAVID D'ALESSANDRIS
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

---

[13] We note that it is the contents of the claim, not the complaint, that determines the Board's jurisdiction. *See Gov't Servs. Corp.*, ASBCA No. 60367, 16-1 BCA ¶ 36,411 at 177,537.

19

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 63259, Appeal of Research Analysis & Maintenance, Inc., rendered in conformance with the Board's Charter.

Dated:  October 18, 2023

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals